| | | |
|---|---|---|
| **Law Offices of Avrum J. Rosen, PLLC** | **Hearing Date:** | **March 8, 2023** |
| 38 New Street | **Hearing Time:** | **10:00 a.m.** |
| Huntington, New York 11743 | | |
| (631) 423-8527 | | |
| Avrum J. Rosen, Esq. | | |
| Nico G. Pizzo, Esq. | | |

*Counsel for the Post- Confirmation Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:                                                          Chapter 11

FRALEG GROUP, INC.,                              Case No.: 22-41410-jmm

                                    Debtor.
--------------------------------------------------------X

### POST CONFIRMATION DEBTOR'S OPPOSITION TO CAF BORROWER GS LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND *IN REM* RELIEF

Fraleg Group, Inc., the post confirmation debtor (the "Debtor"), in this Chapter 11 case, by and through its counsel the Law Offices of Avrum J. Rosen, PLLC, respectfully submits this opposition to CAF Borrower GS LLC's (the "Lender"), *Motion for Relief From the Automatic Stay and In Rem Relief* [Dkt. No. 77] (the "*In Rem* Motion"), and respectfully sets forth and represents as follows:

### PRELIMINARY STATEMENT

1.      The Debtor understands that the Lender is upset that the Auction Sale did not take place by January 31, 2023, as projected by the Plan, but submits that this was due, in large part, by factors beyond  the Debtor's control, and the new proposed sale date of April 18, 2023 does not represent a material change under the Plan, that would provide a basis to call a default under the Plan.  The Injunction in the plan remains in place and the Lender has not shown sufficient cause to permit the state court  auction sale to take place at this time.  The Debtor has no objection to stipulating to lifting of the injunction to permit the state auction sale to take place shortly after the

time of the essence date for a closing of any buyer at the bankruptcy auction sale.. The Debtor continues to work with the Lender to come to an acceptable compromise, but files this Opposition to preserve its rights.  Much of the Lender's *In Rem* Motion is a rehash of its prior Motion and will be addressed herein. The Lender has applied the factors relating to a motion to lift the stay to this post-confirmation motion and the Debtor will address those factors.  First and foremost in this response is the simple fact that the Lender has failed to set forth any evidentiary basis establish cause for the relief sought because (a) equity exists in the Property, (b) the Property is necessary for the reorganization of the bankruptcy estate, (c) the Debtor's second filing was not a bad faith filing, and (d) the Debtor's second filing was not part of a scheme to delay, hinder, or defraud creditors.

## RELEVANT BACKGROUND

**A.**      **The Bankruptcy Filing and the Debtor's Business**

2.      On June 17, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtor continues to operate its business and manage its property as a post-confirmation Debtor pursuant to sections 1107,  1108and 1129 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in this case.

4.       The Debtor is a real estate investment company formed in or around 2017 and its business involves the purchase, ownership, management, rental and/or sale of real estate for profit. The Debtor is a New York corporation, with its corporate office located at 931 Lincoln Place, Brooklyn, New York 11213.

5.      The Debtoris the fee owner of the of the real property commonly known as 112 North Walnut Street, East Orange, New Jersey 07017 (the "Property"). The Property is improved by a 29-unit residential building, which is currently vacant and partially completed.

6.      In addition, the Debtor is also the fee owner of the real property commonly known as 116 North Walnut Street, East Orange, New Jersey 07017 (the "Vacant Lot" together, the "Properties"). The Vacant Lot is unimproved, is adjacent to the Property, and is currently used solely as parking for the Property. Currently, the Debtor does not own or manage any other real estate.  The full facts of the prior case and this case are set forth in the Debtor's Rule 1007 Affidavit [Dkt. No. 5] and are incorporated herein by reference.

7.      The existence of the Vacant Lot is the critical reason why the Lender's motion must be denied.  That lot provides parking for the Property and also has the possibility of being developed in conjunction with the Property to greatly enhance the value of both Properties. Annexed hereto as Exhibit "A" is the May 23, 2022 appraisal of both Properties by Valbridge Property Advisors with different development scenarios.  The values show an "As Is" value of the two Properties of $7,500,000.00  under the current development plan  and $12,000,000.00 under a development plan utilizing the Vacant Lot to increase the number of apartments.

8.      The Lender has not proffered any valuation of the Properties to rebut this appraisal. Indeed, the Lender in its Proof of Claim [Claim No. 5] listed the value of just the Property, not the Vacant Lot, at $7,500,000.00.   Thus, it has not met its initial burden of proving a lack of equity. If the stay is lifted and the bankruptcy sale of the Properties is not permitted to proceed, with proper marketing and adequate time to close, millions of dollars of value will be lost, as the foreclosure sale will not include the Vacant Lot.  Without the Property, the Vacant Lot will have limited value. In consultation with its retained broker, MYC Associates ("MYC") believes that approximately

forty-five (45) days of marketing is required.  The proposed date for the sale is April 18, 2023. This is set to have the auction sale not fall during either the Easter or Passover holidays.  MYC further advised that at least thirty (30) days needs to be permitted to close for a sale of this size and complexity.  The marketing process has already begun and the Order to set the sale date and terms (the sale procedure Order was already approved in the Plan) will be submitted this week. The Debtor requests, and would consent to, the stay  being lifted so that if the sale  does not close by the time of the essence date (because the buyer defaults, for instance) the foreclosure sale can proceed shortly thereafter.  This result protects the Lender, as it is still receiving interest at 10% instead of the New jersey State judgment rate of 3.5% and will only be delayed by about thirty,(30) days from the date that it could obtain a sale date if the motion were granted upon the first return date.

9.      The delay in holding the sale needs to be addressed.  It is clear from what has transpired that the Debtor had great difficulty in obtaining exit financing to fund the Plan.  This was due to rising interest rates and much stricter loan to value ratios for construction loans.  The Debtor did attempt to comply with the dates in the Plan for the sale to be held.  The Order confirming the Plan was entered on December 1, 2022 [Dkt. No.  65-1].

10.      The Plan provided for MYC to be retained  and for marketing efforts to begin by December 15, 2022 if the refinance had not closed by that date.  The Debtor, the Lender and MYC began negotiating the retention in early December, 2022.  A retention Application was prepared and when approval was sought from the United States Trustee's Office. We were advised that professional retentions in Chapter 11 motions now had to be submitted by Notice of Presentment. The application was revised and served out on December 20, 2022 for the first available date in January.

11.     MYC was concerned that due to this change in procedure, it would have insufficient time to market the Properties and was not willing to take the engagement without some compensation from the Lender in the event of a credit bid by the Lender or more time to do the marketing.  There were then negotiations over extending the auction date.  The presentment date came and there was a status conference before the Court where this was explained and a short adjournment was granted to see if it could be worked out.  At that point, it was clear that the auction could not take place by January 31. 2022.

12.     The terms were worked out and right after the next status conference the retention was approved by the Court and MYC immediately got to work marketing the Properties.  The link to the marketing material is https://myccorp.com/properties/stalled-redevelopment-site

13.     There has been a lot of interest in the Properties and several showings.  It is the Debtor's hope that it will be able to supplement the Bidding Terms with a Stalking Horse Purchaser contract.  If there is not sufficient interest to generate bids higher than the lien on the Property, the Lender can exercise its rights to credit bid and obtain the Property at that bankruptcy auction.  It can also bid on the Vacant Lot if it so choses.  The issues raised in the Status Report [Dkt. No. 76] have been rectified.  Annexed hereto as Exhibit "B" are the satisfaction of mortgage and the deed putting the Vacant Lot back into the name of the Debtor.  Those documents have been sent out for recording.

14.     In addition, the Debtor has been working diligently, together with its counsel, on obtaining a refinance under the Plan.  Annexed hereto as Exhibit "C" is the term sheet from the mortgage Broker who is working with a  new lender with a closing anticipated for April 3, 2023. If that occurs, the auction will be cancelled and all Claims paid in full.  That term sheet will be filed as a supplement to this Opposition when it is received.

15. The balance of the Lender's Motion is a rehash of its first motion to lift stat. It is clear that this case was not a bad faith filing. The settlement contained in the plan reduced the Lender's Claim to a little above that which the Claim Objection asserted it was. This reduced the overall claim by over $700,000.00. It is also interesting to note that the settlement permitted the Lender to receive and credit bid, more than the amount of the state court foreclosure judgment. Thus, the Lender may obtain a higher recovery in the Bankruptcy Sale. Such a successful result can hardly be set forth as a baseless filing. The defenses raised in the first motion to lift the stay will be reiterated herein for a complete record.

**B.**     **The Prior Dismissed Bankruptcy Case**

16. Prior to the Petition Date, on September 14, 2021, the Plaintiff previously filed a chapter 11 petition in the dismissed bankruptcy action captioned *Fraleg Group, Inc., Chapter 11 Subchapter V Case Number 21-42322-jmm* (the "Dismissed Bankruptcy"). The Plaintiff was represented by Hemmings & Snell LLP in the Dismissed Bankruptcy.

17. On November 29, 2021, the Lender filed a motion seeking relief from the automatic stay [Dismissed Bankruptcy Dkt. No. 26] (the "Stay Relief Motion"). The Lender's Stay Relief Motion was sought to continue its litigation of the Foreclosure Action.

18. On January 12, 2022, the Debtor filed an objection to the Lender's Stay Relief Motion [Dismissed Bankruptcy Dkt. No. 35].

20. On January 19, 2022 the parties appeared at a hearing on the Lender's Stay Relief Motion and the Court ordered a discovery period.

21. On February 22, 2022, the Lender filed an amended Stay Relief Motion [Dismissed Bankruptcy Dkt. No. 39]. Following a hearing on March 30, 2022, the Court entered an Order

6

granting the Lender's Stay Relief Motion [Dismissed Bankruptcy Dkt. No. 42] with respect to the Property (the "Stay Relief Order").

22.     On May 16, 2022, the Debtor, by and through its then-counsel, filed a motion to voluntarily dismiss the Initial Bankruptcy Case [Dismissed Bankruptcy Dkt. No. 53]. The basis for that motion was that the Debtor had obtained a commitment to pay off the Lender and could only close if the case was dismissed.

23.     The Court entered an Order dismissing the Dismissed Bankruptcy case on June 3, 2022 [Dismissed Bankruptcy Dkt. No. 59] (the "Order of Dismissal").

24.     On June 7, 2022 the Debtor's then-counsel requested a pay-off letter from the Lender's Counsel for a closing scheduled for June 15, 2022. Simultaneously, the adjourned foreclosure sale was scheduled for June 21, 2022. That pay-off letter [Exhibit "B" to the Rule 1007 Affidavit] was for approximately $800,000.00 more than the amount actually due pursuant to the Judgment of Foreclosure and Sale [Exhibit "F" to the 1007 Affidavit].

25.     On July 13, 2022, approximately twenty-six (26) days after the automatic stay was in place in the instant bankruptcy case, the Lender filed the 9024 Motion in the Dismissed Bankruptcy seeking, among other things, an Order voiding the Order of Dismissal, reinstating the Dismissed Bankruptcy case, and declaring the Stay Relief Order to be in effect against the Debtor.

C.    **The Action Taken in the Instance Bankruptcy Proceeding**

26.     On the Petition Date (June 17, 2022), immediately after filing the Chapter 11 Petition in the instant bankruptcy, the Debtor, by and through the undersigned counsel, notified the Lender of the active bankruptcy case filing and the automatic stay.

27.     On June 23, 2022, the Rule 1007 Affidavit was filed [Dkt No. 5] which clearly set forth the allegations against the Lender and its Counsel for filing a false claim and lift stay motion

in the Dismissed Case and in persisting its demand for approximately $800,000.00 more than the amount due pursuant to the Foreclosure Judgment. It must be noted that in none of the pleadings filed by the Lender, has it disputed those calculations.

28.     The Debtor timely filed its full petition, schedules, statements and supporting documents.

29.     On July 14, 2022, the Lender filed the first *In Rem* Motion.

30.     On July 25, 2022, the Debtor commenced an adversary proceeding against the Lender in the instant bankruptcy case, styled as *Fraleg Group, Inc., against CAF Borrower GS LLC and Polsinelli PC*, Adversary Proceeding Number 22-01060-jmm (the "Adversary Proceeding"). The Debtor seeks, *inter alia*, damages and contempt based on the defendants' alleged fraud and abuse of process. All of these actions were resolved in a consensual Plan.

## DISCUSSION

### I.     The Lender Failed to Make a *Prima Facie* Case for Relief from the Automatic Stay

31.     Both of the Lender's *In Rem* Motions failed to make a *prima facie* case because it seeks relief from the automatic stay pursuant to section 362 of the Bankruptcy Code, however it argues that it should be entitled to that relief by using the court's analysis used to dismiss a bankruptcy.

32.     It is well settled in the Second Circuit that that the movant bears the burden of establishing sufficient cause to justify lifting the automatic stay. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990). To establish cause, the court's look to an examination of the factors set forth in *Sonnax*.

33.     Not only did the Lender fail to establish that the *Sonnax* factors weigh in favor of lifting the stay, the Lender failed to even cite the case to establish a *prima facie* case to lift the

automatic stay.

34.    "If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990). If the movant fails to demonstrate sufficient cause, the burden does not shift; rather, the court should refuse to grant relief from the stay. *In re Schick*, 232 B.R. 589, 600 (Bankr. S.D.N.Y. 1999).

## II.    The Facts of the Debtor's Case Do Not Support Lender's Request for Relief from the Automatic Stay under Section 362(d)(2)

35.    The Lender argues that it is entitled to relief from the automatic stay pursuant to section 362(d)(2) of the Bankruptcy. However, the Lender has presented its arguments under section 362(d)(2) using old appraisals (which are not attached to its *In Rem* Motion), questionable secured loan values, and irrelevant facts as to the Debtor's business to support its argument.

### i.    Equity exists in the Property

36.    The Lender is not entitled to relief from the automatic stay under section 362(d)(2) of the Bankruptcy Code because there is equity in the Property.

37.    The Debtor is the fee owner of the Property and the Vacant Lot. The Debtor asserts that there is equity in the Property and Vacant Lot combined because according to an appraisal dated May 23, 2022, the "as is" value is not less than $7,500,000. Attached hereto as **Exhibit "A"** is a copy of the appraisal.

38.    The Debtor asserted that the Lender was only owed approximately $4,429,746.87, and the Lender agreed to a claim of $4,500,000.00 in the Plan.  In other words, the Debtor's position was correct.  It is disturbing that the Lenders Motion still asserts that it is oved over $5,500,000.00, which indicates that it may again seek to assert an improper amount in the state court foreclosure.

39.    Thus, the Lender is not entitled to relief from the automatic stay.

**ii.    The Property is necessary to an effective reorganization
of the Debtor's bankruptcy estate**

40.    Even in the event that the Debtor did not have equity in the Property, the Lender is not entitled to the relief it seeks because the Property is necessary to an effective reorganization of the Debtor's bankruptcy estate.

41.    As the Lender correctly cited, the debtor need not show that the plan is confirmable, but that the things which are to be done after confirmation can be done as a practical matter. *In re 160 Bleecker St. Assocs.*, 156 B.R. 405, 410–11 (S.D.N.Y. 1993). "A motion for relief from the stay should not be turned into a confirmation hearing; the debtor need only show that where there is lack of equity, the proposed plan has a realistic chance of being confirmed and is not patently unconfirmable." *See. United Sav. Ass'n of Tex v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 375 (1998); *In re Kolnberger*, 603 B.R. 253, 269 (Bankr. E.D.N.Y. 2019).

42.    Of course the Plan was confirmed and is still capable of being successfully concluded with only the delay of two and a half months on the auction sale.  This is hardly the type of change that would be considered a major modification of the Plan that should cost the estate millions of dollars in equity on these Properties.

**III.    The Facts of the Debtor's Case Do Not Support Lender's Request for Relief
from the Automatic Stay under Section 362(d)(1)**

41.    The Lender argues that the bankruptcy filing was a bad faith filing under the Bankruptcy Code, and thus should be used as a factor to lift the automatic stay in this proceeding. The Debtor asserts that the instant bankruptcy was not filed in bad faith.

42.    In support of its motion, the Lender has relied heavily on the application of the

"bad-faith" factors set forth in *C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1311 (2d Cir. 1997). However, the *C-TC* factors should only "guide courts" in "assessing the totality of the circumstances," and "[d]epending on the situation, one or another factor may have greater weight, and the number of factors on one side or the other of the balance is not, standing alone, determinative of the outcome." *In re 300 Wash. St. LLC*, 528 B.R. 534, 551 (Bankr. E.D.N.Y. 2015) *quoting In re Hartford & York LLC*, No. 13-45563, 2014 Bankr. LEXIS 997, 2014 WL 985449,*4 (Bankr. E.D.N.Y. 2014).

43.     Even if all, or nearly all, of the *C-TC* factors are arguably present, a debtor may still establish that it has an ability to effectively reorganize. *See e.g., In re 68 W. 127 St., LLC*, 285 B.R. 838 (Bankr. S.D.N.Y. 2002). Applying a "mechanical approach" to the *C-TC* bad faith factors "would automatically doom almost every single asset case, *ab initio*." *In re Willows of Coventry, Ltd. P'ship*, 154 B.R. 959, 967 (Bankr. N.D. Ind. 1993).

44.     Additionally, in its analysis of the *C-TC* case, the Lender has neglected to address the impact of the enactment of section 362(d)(3) of the Bankruptcy Code, which states:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—
>
>> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>> (B) the debtor has commenced monthly payments that—
>>
>>> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2) [11 USCS § 363(c)(2)], be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate

11

(other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate;

11 U.S.C. §362(d)(3).

45.     Since the enactment of section 362(d)(3) of the Bankruptcy Code in 2005, the cases have modified how the *C-TC* factors are applied. *Arm Ventures, LLC*, 564 B.R. 77, FN 14 (Bankr. S.D. Fla. 2017) ("After adoption of the single asset real estate provisions, the fact that a debtor only has one asset and few or no employees is not as significant when the debtor complies with the requirements of 11 U.S.C. §362(d)(3) and timely files a plan or starts making the required payments). *In In re RYYZ, LLC*, 490 B.R. 29 (Bankr. E.D.N.Y. 2013). In this case, the Debtor's time pursuant to that section has not yet run.

46.     Judge Feller went through a thorough review of the case law on the similarities between a motion to lift stay and a motion to dismiss in light of section 362(d)(3), finding that section 362(d)(3) is designed to protect secured creditors by requiring debtors to act quickly, either by filing a confirmable plan within a prescribed timeframe or by compensating the creditor with statutory payments. *See, e.g., NationsBank, N.A. v. LDN Corp.* (*In re LDN Corp.*), 191 B.R. 320, 327 (1996) (stating that Section 362(d)(3) "was enacted to assist secured creditors in single asset real estate cases"); *In re Heather Apts. Ltd. P'ship*, 366 B.R. 45, 50 (Bankr. D. Minn. 2007) ("[W]here the case does not early kick forward toward confirmation," the purpose of Section 362(d)(3)(B) is to "compensate [the] mortgagee for the time-value of the mortgagee's debt investment, by the payment of interest at the original contractual rate.").

47.     At the same time, section 362(d)(3) provides a window of opportunity for debtors. Section 362(d)(3)'s specific, albeit nonexclusive, criteria for stay relief ought to counsel against

knee-jerk motions at the outset of the case that merely parrot the elements of "bad faith," or other grounds for relief, just because the case involves single asset real estate. *LDN*, 191 B.R. at 327. Its parameters often dictate how a case proceeds, allowing debtors to focus their efforts on formulating and filing a meaningful plan and/or negotiating a compromise. Thus, Section 362(d)(3) protects secured creditors by "'ensur[ing] that the automatic stay provision is not abused,'" and helps debtors by affording them an "'opportunity to create a workable plan of reorganization.'" *Id.* at 326 (quoting S. Rep. No. 103-168, 1st Sess. (1993)).

48.     In *In re 68 W. 127 St., LLC*, 285 B.R. 838, 846 (Bankr. S.D.N.Y. 2002). Judge Drain set forth the interplay between these two statutes as follows:

> In practice, cases relying on "bad faith" therefore generally hinge on reasons that also would satisfy the specifically listed criteria in sections 362(d)(2) and 362(d)(3) of the Bankruptcy Code, or on several of the specific criteria in sections 1112(b)(1)-(10), as the case may be. *In re Gucci*, 174 B.R. 401, 410 (Bankr. S.D.N.Y. 1994). See also 3 COLLIER ON BANKRUPTCY P 362.07[6][a] (15th ed. 2002), at 362-105 (noting that Congress' enactment of section 362(d)(3) recognizes the propriety of reorganization by "single asset real estate" debtors, absent extraordinary circumstances, notwithstanding their violation of most of the commonly listed bad faith factors out of the gate).

*In re 68 W. 127 St., LLC*, 285 B.R. 838, 846 (Bankr. S.D.N.Y. 2002).

49.     Congress has made it clear that the filing of the typical single asset real estate case is both permitted and is not *per se* bad faith.

50.     Turning next to the elements alleged by the Lender, the Lender's argument is flawed on several aspects.

51.     First, the Debtor does not have *only* one asset. The Debtor is also the owner in fee simple in the Vacant Lot. The Vacant Lot has value, and together with the Property, that value is expanded as it provides the parking necessary by the municipality for the housing development

plan of the 29-unit building at the Property.[1]

52.     As the Lender pointed out, the Debtor does have unsecured creditors.

53.     Lastly, while the Debtor's primary asset was in foreclosure and the instant chapter 11 petition was filed before the foreclosure sale, the Debtor asserts that did not file the petition in bad faith because it has a plan to satisfy the Lender's true and accurate claim owed. Additionally, the Debtor intends to finance the rest of the construction required to sell the units at the Property for a profit or to conduct the bankruptcy auction contemplated by the Plan.

54.     As it was more fully alleged in the 1007 Affidavit, the pleadings filed in this bankruptcy matter and the Adversary Proceeding filed, the Debtor is not seeking to simply frustrate the foreclosure sale and buy an extension of time from the automatic stay. The Debtor has not only set forth its intentions from the inception, but it has already taken many steps in furtherance of putting forth a confirmable chapter 11 plan., which was confirmed and can be completed if given a little bit more time.

**IV.     The Debtor's Second Filing Does Not Entitle the Lender Relief
From the Automatic Stay**

55.     The Lender argues that the Debtor's second bankruptcy filing alone is proof that the petition was filed in bad faith and was part of a scheme to delay, hinder, or defraud creditors under section "364(d)(2)(B)" of the Bankruptcy Code. The Debtor asserts that it was not filed in bad faith and was not part of any scheme to delay, hinder or defraud creditors.

56.     In addition, the Debtor has set forth in its multiple timely filed pleadings, 1007 Affidavit and Adversary Proceeding the purpose of filing the instant bankruptcy is to, among other things, resolve the issues of the Lender's alleged claim and to obtain financing to  pay the Lender's

---

[1] As noted in the attached appraisal [Exhibit A. Pg 4] that additional parking may permit a total of 47 units resulting in a $12,000,000 value.

allowed claim and complete the construction as an exit strategy. Furthermore, the Debtor has retained experienced bankruptcy counsel to handle the few remaining issues and set forth a confirmable plan to reorganize the Debtor's estate in a timely manner.

57.     The Debtor is not seeking to frustrate the foreclosure process, but simply protecting its rights in the Property. The Debtor did not file the instant bankruptcy as part of a scheme to delay, hinder, or defraud creditors. The Debtor simply intends to reorganize its bankruptcy estate.

## V.     <u>The Lender is not Entitled to Equitable relief under the Doctrine of Unclean Hands</u>

58.     The Lender should not be entitled to an equitable remedy – relief from the automatic stay – in this case under the doctrine of unclean hands because it filed a false claim in the Dismissed Bankruptcy, and maintained that it was owed more than $800,000.00 more than the amount due pursuant to the Foreclosure Judgment until the Debtor brought a Claim Objection which resuled in over a $700,000.00 reduction in that Claim pursuant to the settlement in the Plan.

59.     The doctrine of unclean hands is based on the maxim that "one who comes into equity must come with clean hands." *Bentley v. Tibbals*, 223 F. 247, 1915 Dec. Comm'r Pat. 251 (2d Cir. 1915). The defense is limited by the rule that the plaintiff's improper conduct "must be related in some substantial and significant way to the claim he now asserts." 1 Dan B. Dobbs, Law of Remedies § 2-4(2), at 95 (2nd ed. 1993) ("DOBBS") (footnote omitted).

60.     Thus, under New York law, the unclean hands doctrine "bars the grant of equitable relief where the defendant proves: '(1) that the plaintiff is guilty of immoral, unconscionable conduct directly related to the subject matter in litigation; (2) that the conduct was relied upon by the defendant; and (3) that the defendant was injured thereby.'" *Atl. Cas. Ins. Co. v. Coffey*, 548 F. App'x 661, 664 (2d Cir. 2013) (*quoting Lia v. Saporito*, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012), cert. denied, 134 S. Ct. 2305, 189 L. Ed. 2d 176 (2014)).

61.     The Debtor's Rule 1007 Affidavit together with the complaint filed in the Adversary Proceeding, set forth the allegations against the Lender and its Counsel surrounding the circumstances of the false claim that was filed in the Dismissed Case and in persisting its demand for approximately $800,000.00 more than the amount due pursuant to the Foreclosure Judgment.

62.     The requirements under the unclean hands doctrine are met in this case based on the following three (3) reasons.

63.     First, the conduct in question – the Lender's false proof of claim based off the Lender's inflated payoff value – is related to the subject matter of this motion because it seeks to lift the automatic stay to pursue a foreclosure sale, based on its inflated payoff value.

64.     Second, the conduct was relief upon by the Debtor because it dismissed its Dismissed Bankruptcy with the goal of refinancing but with the inflated value of the loan, the Debtor could not have refinanced the higher amount and funded the construction.

65.     Third, the Debtor was injured when it lost its proposed financing to finish the project and had to incur costs to file the instant bankruptcy to remedy the issue.

66.     Therefore, the unclean hands doctrine should now bar the Lender from seeking equitable relief.

WHEREFORE, it is respectfully requested that the *In Rem* and lift stay Motion must be denied., or this Court should enter an Order permitting the state court auction to be noticed for a date after the Time of the Essence date in the Bankruptcy Sale.  In the alternative he Debtor also requests that the upcoming hearing be set as the preliminary hearing pursuant to 11 U.S.C. Section 362€ and that a subsequent evidentiary hearing be set by the Court, together with such other and further relief as this Court deems just and proper.

Dated: March 1, 2023,                                    Respectfully submitted,
        Huntington, New York

16

**Law Offices of Avrum J. Rosen, PLLC**

By:     <u>*/s/ Avrum J. Rosen*</u>
        Avrum J. Rosen, Esq.
        Nico G. Pizzo, Esq.
        38 New Street
        Huntington, NY 11743
        (631) 423-8527
        arosen@ajrlawny.com
        npizzo@ajrlawny.com

        *Proposed Counsel for the Debtor*
        *and Debtor-In-Possession*